# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington DC 20580,

                Plaintiff,

                vs.

AUTOMATIC FUNDS TRANSFER
SERVICES, INC.,
151 S. Lander St. Suite C
Seattle, Washington 98134

a corporation;

and

ERIC JOHNSON,
2201 Fairview East No. 8
Seattle, Washington 98102

Individually and as an officer of
Automatic Funds Transfer Services,
Inc.,

                Defendants.

Civ. No.

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF**

Plaintiff,  the Federal Trade Commission ("FTC" or  "the Commission"), by

its undersigned attorneys, for its Complaint alleges as follows:

1.      Plaintiff brings this action under Sections 5, 13(b), and 19 of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45, 53(b) , 57b, and the

Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, which authorizes the Plaintiff to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief, for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) , and in violation of the TSR.  Defendants' violations include assisting and facilitating one or more telemarketers' unlawful activity.

## SUMMARY OF THE CASE

2.      Defendant Automatic Funds Transfer Services, Inc. ("AFTS"), a payment processor, debited at least $31 million dollars from consumers' bank accounts on behalf of a fraudulent telemarketing scheme known as Student Loan Group ("SLG").

3.      SLG deceptively sold bogus student loan debt relief services to tens of thousands of American consumers.

4.      AFTS and Johnson assisted and facilitated SLG's scheme through the processing of consumer payments while knowing, or consciously avoiding knowing, of SLG's unlawful conduct.

5.      AFTS's payment processing on behalf of SLG caused substantial injury to numerous consumers, including consumers in this District, and violated Section 310.3(b) of the TSR.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

7.     Venue is proper in the United States District Court for the District of

Columbia under 28 U.S.C. §§ 1391(b)(2), 1391 (c)(1), 1391(c)(2), 1395(a) and 15

U.S.C. § 53(b).  Defendants transact business in this District.

## PLAINTIFF

8.     The FTC is an independent agency of the United States Government

created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or

affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§

6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces

the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing

acts or practices.

## DEFENDANTS

9.     Defendant Automatic Funds Transfer Services, Inc. is a Washington

corporation with its principal place of business at 151 South Lander Street Suite C,

Seattle, Washington 98134-1889.  AFTS provides payment processing services to

merchants.  At all times relevant to this Complaint, AFTS transacts or has transacted business in this District and throughout the United States.

10.     Defendant Eric Johnson ("Johnson") is the President and 100% owner of AFTS.  Defendant Johnson plays an active role in the management and supervision of AFTS's payment processing activities.  He materially participated in the unlawful acts or practices set forth in this Complaint.

11.     In his capacity as President of AFTS, Defendant Johnson formulated, directed, controlled, participated in, or had the authority to control, the acts and practices of AFTS, including the acts and practices alleged in this Complaint.  At all times relevant to this Complaint, Defendant Johnson transacts or has transacted business in this District and throughout the United States**.**

## COMMERCE

12.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE ACH NETWORK FOR ELECTRONIC FUNDS TRANSFERS

13.     AFTS used the Automated Clearing House ("ACH") network to process electronic debits to consumers' bank accounts on behalf of SLG.

14.     ACH transactions are transmitted between financial institutions through electronic data transmission using a batch processing system called the ACH network.  A common example is direct deposit of an employee's salary.

15.     ACH payment processors, such as AFTS, have contractual relationships with banks through which they transmit ACH transactions on behalf of merchants through the banking system.

16.     ACH transactions are the subject of oversight and scrutiny by the National Automated Clearing House Association ("NACHA"), a private self-regulatory trade association that enforces a system of rules, monitoring, and penalties for noncompliance.

17.     NACHA monitors the levels at which ACH debits are returned by consumers or consumers' banks.  Historically, one of the primary indicators that a merchant is engaged in fraudulent conduct is a high rate of returned transactions. Typical causes of a high return rate include debiting consumers without their authorization and obtaining consumer debit authorizations through deceptive representations or omissions regarding the product or service sold.

18.     The monitoring of merchant return rates is a key component of risk management practices for banks and payment processors.  Under NACHA guidelines, all participants in the ACH network, including banks and processors, are expected to "know their customer," monitor return rates and other suspicious

behavior to prevent fraud or other illegal activity, and investigate the business practices of merchants that generate unusually high return rates.

19.     An unauthorized return rate in excess of 0.5% could result in NACHA notifying the Originating Depository Financial Institution (i.e., the processor's bank) of the return rate, and potentially assessing fines.

20.     Banks routinely require payment processors with which they contract to conduct due diligence on merchants that seek access to the ACH network through the processor and the bank, and to monitor such merchants' return rates and any suspicious activity.

## DEFENDANTS' UNLAWFUL PAYMENT PROCESSING

21.     Between August 2014 and July 2019, AFTS, led by Johnson, debited consumer-victims' bank accounts on behalf of SLG with knowledge, or while consciously avoiding knowing, of SLG's unlawful conduct.

### The SLG Fraudulent Telemarketing Scheme

22.     SLG deceptively sold bogus student loan debt relief services to U.S. consumers in violation of the FTC Act and the TSR.

23.     SLG's principals used numerous and frequently-changing companies, shell companies and dba names to operate their fraudulent telemarketing scheme.

24.     SLG used various misrepresentations to lure consumers into purchasing its debt relief services, including that: (1) consumers who purchase its

services will be enrolled in a repayment plan that will reduce their monthly payments to a lower, specific amount or have their loan balances forgiven in whole or in part; (2) most or all of consumers' monthly payments to SLG will be applied toward consumers' student loans; and (3) SLG will assume responsibility for the servicing of consumers' student loans.  SLG also obtained payments from consumers for its debt relief services before it had renegotiated, settled, reduced, or otherwise altered the terms of the consumers' debts, which is a violation of the TSR.

25.    SLG instructed its customers to cease making payments to their student loan servicers and, instead, to make monthly payments to SLG.  It then engaged in a variety of dishonest tactics to arrange for consumers' loans to go into forbearance, deferment, or zero dollar monthly payment status where lenders would not expect to receive monthly payments nor contact consumers when payments were not received.

26.    Many consumers ultimately discovered, sometimes after years of making monthly loan payments to SLG, that SLG failed to apply most or any of their payments to their student loan balance.  In numerous instances, SLG also failed to obtain the lower monthly payment amount or loan balance that it promised consumers.

27.     SLG charged consumers advance fees prior to performing any debt relief services, in violation of Section 310.4(a)(5)(i) of the TSR ("Advance Fee Rule").  SLG typically collected one to three "initial" payments ranging from $100 to $500, and then collected ongoing monthly payments in another amount, typically ranging from $50-$200.

28.     SLG collected approximately $773 to $7,000 for its debt relief services per consumer, the majority of which it led consumers to believe was going towards paying off the consumers' student loan debt.  In truth, in numerous instances, that money was pocketed by SLG.

29.     SLG was not a federal loan servicer and, despite its representations to consumers, had not taken over or purchased consumers' student loans.

30.     Many consumers reported that SLG made no payments towards their student loans.  Other consumers learned that SLG had only made one payment to their loans in over a year or several years of participation.

31.     Moreover, because SLG failed to apply most or any of consumers' payments to their student loans, many consumers had accrued additional capitalized interest on the balance of their loans.

32.     On July 8, 2019, the FTC sued SLG and its principals for violating the FTC Act and the TSR.  *FTC v. Elegant Sols., Inc.*, No. 8:19-cv-01333, ECF No. 1 (C.D. Cal., July 8, 2019).

33.    The Court granted summary judgment in favor of the FTC and found that SLG violated the FTC Act and the TSR.  *Elegant Sols.*, 2020 U.S. Dist. Lexis at *22-*29.  On July 17, 2020, after granting summary judgment to the FTC, the court entered a final judgment against the SLG defendants, including conduct and monetary relief.  *Elegant Sols.*, No. 8:19-cv-01333, ECF No. 184 (C.D. Cal. July 17, 2020).

### Defendants' Payment Processing for the SLG Scheme

34.    AFTS provided SLG with access to the U.S. banking system and ACH network through AFTS's contractual relationships with banks, controlled the procedures through which money was debited from consumers' bank accounts, and disbursed consumer funds to SLG, directly or indirectly through other processors and entities.

35.    AFTS and Johnson were well aware that SLG was using various company and dba names to conduct its business and charge its customers.  AFTS processed for SLG, using SLG's various company and dba names, during two different time periods:

(a) August 2014 to March 2016 ("First Period"); and

(b) October 2017 to July 2019 ("Second Period").

36.    For the two periods combined, AFTS processed a total of more than $31.1 million in ACH debits to consumer bank accounts on behalf of SLG.

37.     While processing for SLG, AFTS and Johnson became aware that SLG's return rates were unusually high and that numerous consumers and consumers' banks reported that SLG's debits were not authorized by the consumer.

38.     During both periods, Defendants also knew, or consciously avoided knowing, that SLG (1) requested or received payment of a fee for debt relief services before SLG had renegotiated, settled, reduced or otherwise altered at least one debt pursuant to a debt management plan and the customer had made one payment to that debt management plan; (2) was misrepresenting material aspects of SLG's debt relief services, or making a false or misleading statement to induce consumers to pay for goods or services, including telling consumers their monthly payments to SLG would be applied to consumers' student loans.

**AFTS's Processing for SLG During the First Period**

39.     During the First Period, AFTS processed more than $13.76 million of ACH debits for SLG through a "nested" relationship with two other payment processors, Payment Automation Network, Inc. ("PAN") and Max Tech, Inc. dba RubikPay ("RubikPay"), a company formed by SLG's principals to perform in-house processing for SLG.

40.     Under this nested arrangement, AFTS had no direct contractual relationship with SLG.  It pretended that its "client" was the processor (PAN and later RubikPay), which had the contractual relationship with SLG.  AFTS,

however, was fully aware that the merchant on behalf of whom it was processing payments was SLG, not PAN or RubikPay.

41.     Between August 2014 and January 2016, AFTS processed for SLG via a nested relationship with PAN.  AFTS debited the bank accounts of SLG customers, deposited these funds into AFTS's bank account, and then transferred them to one or more bank accounts held in the name of PAN (instead of directly to SLG).  PAN in turn would transfer the funds to SLG.

42.     AFTS did not have any formal underwriting policy for SLG and did not receive any underwriting documentation.

43.     SLG used an array of frequently-changing companies and dba names, including Student Loan Services, SLS Managers, D.O.R.M Group, National Secure Processing, NSP, NSP Processing, Student Loan Group, SLG, EDU Student Loan, Tribune Management, Inc., Heritage Asset Management, Inc., and RubikPay.

44.     AFTS was aware of SLG's use of numerous changing names, and knew that this practice made it harder for consumers, banks, NACHA, and regulators to identify the true identity of the merchant responsible for the debits to consumers' bank accounts.

45.     In late 2015, SLG principals Mazen Radwan, Rima Radwan and Dean Robbins formed their own in-house processing company, RubikPay, and recruited AFTS's then contracts manager, Chris Pefley ("Pefley"), to join RubikPay.

46.     Between January 2016 and March 2016, AFTS processed debits for SLG through RubikPay.  AFTS forwarded the funds it debited from the bank accounts of SLG customers to bank accounts held in the name of RubikPay or, in some instances, to other bank accounts controlled by SLG's principals.  RubikPay would then transfer the funds to SLG.

**Defendants' Knowledge of SLG's Deceptive Conduct During the First Period**

47.     Shortly after it began processing for SLG, AFTS started seeing red flags about SLG's business practices, including high return rates, complaints from banks and consumers, and the use of different company and dba names.  Instead of investigating or terminating processing for SLG (through PAN and later RubikPay), AFTS continued processing for the fraudulent telemarketing scheme up until SLG stopped using AFTS's processing services on March 11, 2016.

48.     Also shortly after it began processing for SLG in August 2014 and throughout the first period, AFTS started receiving consumer complaints and reports regarding SLG's deceptive practices.  These complaints included consumers stating that they had not authorized the debit to their bank accounts, did not recognize the debiting company or what the debit was for, had not agreed to the specific amount of the monthly debit or purported "new student loan payment amount," and/or had not agreed to any initial "down payment" charge.

49.    Throughout the First Period, AFTS also received numerous consumer complaints stating that, contrary to what SLG had promised consumers, SLG was failing to apply consumers' payments towards their student loans.

50.    In some of the consumer complaints that AFTS received, the consumers or their banks described SLG as an outright scam.

51.    AFTS's bank often forwarded consumers' inquiries directly to Johnson or AFTS's controller, and Johnson and AFTS's controller handled numerous phone calls from consumers complaining about SLG's deceptive practices.

52.    AFTS and Johnson would routinely forward consumer complaints directly to SLG, PAN's president, Ken Martinez ("Martinez"), or RubikPay.

53.    In addition, AFTS's bank routinely forwarded to AFTS notices of SLG's high return rates, including returned transactions of consumers who had filed affidavits with their banks, stating that they had not authorized the debits.

54.    Email correspondence involving Johnson shows that Defendants knew since shortly after starting to process payments for SLG that SLG was generating a high volume of ACH returns, indicating that SLG was charging consumers without having obtained legitimate consumer authorizations for doing so.  The correspondence also shows Defendants' knowledge of numerous consumer

complaints about SLG's unlawful conduct, including the fact that SLG was failing

to make payments to consumers' student lenders.  For example:

- On October 23, 2014, just two months after AFTS began processing for SLG, Johnson sent an email to Martinez, in which he wrote that SLG's "high volume of ACH returns is a possible indication that ACH authorizations have not been well obtained."

- On January 8, 2015, Johnson sent an email to Martinez about a consumer, stating: "A payment of $109 was withdrawn … No record of that payment has been recorded by the organization holding the student loan."

- A November 3, 2015 email from Johnson to Martinez regarding another consumer, stating: "Fed Loan Servicing is the only student loan consolidator she has been working with, but they have denied knowledge of the payment in a phone call to them."

- A February 1, 2016 email from AFTS's controller to SLG regarding a consumer stated: "She said that no payments have been applied to her student loan . . . ."

- A February 22, 2016 email from AFTS's controller to SLG about another consumer, stating that the consumer "is concerned about fraud on her account."

- In a March 13, 2016 email Johnson sent to RubikPay, Johnson wrote: "This caller contacted AFTS directly on referral from the caller's bank to AFTS' bank.  She contends that none of the payments made in the past year have been applied to her student loan.  This is the second similar situation of many payments not being made.  We are expecting many more as students look for the 2015 1098 statements from their lenders in anticipation of filing their tax returns."

- Johnson forwarded to SLG's attorney a March 2016 consumer complaint, in which the consumer wrote: "Religiously, each month on the 10th my payment of $160.73 came out of my bank account that was marked "EDU STUDENT LOAN" so nothing seemed suspicious. (total of $1,944 came out to date - I believe). I went to file my 2015 taxes but never received my tax document with the interest paid on my student loan so I started making calls. I contacted my student

loans and was in shock when I was told not a penny was made towards my student loans. The Loan Rep said they sent me monthly updates on the loan amount and when she read off my contact information it was incorrect. In fact, the SLS Managers [SLG] had their contact and address information as their own in place of mine. Over the 13 months of payments, I did not receive any benefit or value from this company. … She advised me that I was conned by a third party processing company that preys on people with student loan debt and they have NO association with my federal loans. The Rep was aware of this scam (and this company) and recommended I quickly call my bank to unauthorize these payment and explain the fraud."

55.    AFTS and Johnson also knew that SLG likely had a practice of collecting and holding consumers' payments for a year in PAN's bank accounts, while making no payments to the consumers' lenders.  For example, on December 9, 2015, AFTS's vice president sent an email to Johnson, in which he described his conversation with another AFTS manager:

> We discussed SL[G] and [the manager's] visit to Ken [Martinez] before Thanksgiving… Re: SL[G], he said that Ken [Martinez] told him that he was holding all the money for debited [*sic*] in his trust account. SL[G]'s program is to collect payments for 1 year, make no payments to underlying lenders to get them motivated to renegotiate their loan terms to get payments moving again. With the one-year accumulated payments then used to make those payments (I guess). Maybe this is all stuff you know, but thought I would pass it along….

56.    AFTS and Johnson knew that the "trust accounts" referenced in the above quote were merely entries on PAN's books or records, not actual trust accounts that were owned and controlled by consumers.

57.     Additionally, Johnson and AFTS were aware of numerous consumer complaints to the Better Business Bureau ("BBB") and on various websites about SLG, and often shared such complaints with AFTS employees.  These complaints often described SLG as a scam, and/or described various red flags indicating that SLG likely was a scam.  For example:

- In an October 27, 2014 email Johnson sent to Martinez discussing consumer complaints, Johnson wrote:  "Their customer [*sic*] are reporting that they are feeling 'scammed.' A toll free phone number that is no longer operational is a good indication of a scam. NSLManagers.com seems to be the same organization as NSProcessing.com. They operate with nearly identical website services, from adjacent suites. The NSL phone number doesn't work, but the NSP phone number does. A call to a NSP client services rep indicates that they know nothing about NSL. Yet Mathew Johnson (Kayla Madera's sales agent at NSL) does work there. But he really works for SLSManagers.com (with different phone number from NSP) – again at the same address. What is the business model of NSL, NSP, and SLS – all three doing the same thing at the same address, with one of the phones disconnected?..."

- In an October 30, 2014 email Johnson sent to Martinez, Johnson forwarded several links to complaints regarding a merchant that Martinez subsequently confirmed was associated with SLG, writing: "it is not a good sign when a significant portion of the Google searches show up on complaint sites. The BBB shows 435 complaints in 3 years, 81 in the past 12 months … They have also been involved in a fraud suit."

- In an October 27, 2014 email Johnson sent to Martinez, Johnson forwarded BBB complaints regarding two dbas used by SLG, writing: "Also please read the 31 BBB complaints regarding SLS Managers since June. They are still occurring in October…."

58.     In addition to receiving and discussing complaints from consumers and their banks, Defendants also reviewed financial data relating to SLG's overall

"credit" and "debit" ACH batch transactions and flow of funds.  That data indicated

to Johnson and AFTS that SLG was, in numerous instances, likely failing to make

payments to consumers' student lenders.  For example:

- In a February 11, 2016 email Johnson sent to AFTS's controller, Johnson wrote:  "I will quiz Chris [Pefley] regarding why a consolidator [SLG] isn't holding more [customer] funds for future disbursements to lenders."

- On February 16, 2016, Johnson sent two emails to AFTS's controller, reiterating his suspicions that SLG was not using consumer funds to pay down the consumers' student loans.  Johnson wrote:  "Where is the money going? What are the names on the 39 accounts where the funds are sent? It still seems like too much is not going for the benefit of the students."  In the second email, Johnson wrote:  "We still aren't seeing much money going to pay down loans, and we don't know what [SLG companies] NSP and TSLG do with their funds."

59.      Indeed, from as early as December 2014, Johnson himself was often

referring to SLG as a fraud and a scam.  For example:

- In a December 20, 2014 email Johnson sent to Martinez regarding a consumer complaint, Johnson wrote:  "Our patience in dealing with apparent fraudulent ACH authorizations is limited."

- In a January 26, 2015 email Johnson sent to Martinez, Johnson wrote: "We have always been suspicious that your clients have deceptive consumer practices, if not outright fraudulent ones. Continual name changes and selling the services to subsequent servicing organizations, is one of the ways to hide legal liabilities and keep one step ahead of regulatory authorities . . . The business model of your customers is still highly suspect based on their debit history and our conversations with their customers.

- In a January 4, 2016 email Johnson sent to SLG's attorney, Robert Bare ("Bare"), Johnson wrote:  "The $20K check came from National Secure Processing, Sioux Falls, SD. How are they related to your client? Try Googling 'National Secure Processing.' They are all SCAM reports…."

- In an April 15, 2016 email Johnson sent to Bare, Johnson wrote: "I find it incredulous that you (and SLG) are arguing that SLG is not responsible for reimbursing AFTS (or PAN) for returned debits from which SLG was the beneficiary. You are arguing that SLG can retain the proceeds from alleged fraud, leaving AFTS as the fall guys…"

60.    On February 9, 2015, Johnson sent AFTS's controller a draft email he was thinking of sending to one of SLG's principals ("Mike"), asking the controller for his thoughts.  The draft email discussed protecting AFTS from potential liability associated with SLG's unlawful conduct.  It stated:

> Mike, I suspect that you or your lawyers are aware of this case: http://business.cch.com/BANKD/201310_cfpb_meracord-proposed-stipulated-final-judgment-and-consent-order.pdf. It involves Meracord, an organization similar to ours. In fact they had been our largest competitor on the West coast. They are now out of business because of their involvement with debt consolidators. Their primary fault was taking fees in advance [of providing debt relief services], which you indicated you do not do.

> But your organization(s) have not fared well in the realm of deceptive consumer practices. A google of "SLS Managers" immediately obtains the additional suggestion of "SCAM." I'm sure that you are well aware of the complaints below. It is also a very good reason for the ACH debit name changes that we have had you request.

> Part of the discussion on Tuesday will be regarding ways to insure [sic] that AFTS is not involved in any deceptive or fraudulent practices of your organizations. Dealing through PANI is one approach to removing that liability….

61.    In reply to Johnson's email, AFTS' controller wrote: "I think we should absolutely be upfront with our concerns.  You and I both thought last fall that we still wouldn't be doing this."

62.     In a February 9, 2016 email Johnson sent to Martinez, Johnson stated that PAN's student debt relief clients (which included SLG) were misrepresenting to consumers the "terms and conditions" of their alleged services.  Johnson proposed to increase the amount of fees AFTS would charge those clients, stating:

> Please locate the authorization for the attached request from USAA Federal Savings Bank. These requests indicate that your clients have failed to communicate terms and conditions to customers. Services to customers has [*sic*] been so poor that they have reverted to the banking system to redress their grievances. AFTS proposes to charge your clients, after April 1, 2016, an additional $50 for the extra effort required to respond to these requests….

63.     Johnson expressed ongoing concerns about AFTS's potential liability. In a February 18, 2016 email Johnson sent to AFTS's controller, Johnson wrote: "Note that the [student loan debt relief] industry has not been targeted directly by governmental investigation.  Instead it has been payment processors to that industry (like AFTS) who have been targeted…."

64.     Johnson then listed numerous Consumer Financial Protection Bureau ("CFPB") and FTC cases against payment processors, and went on to reason that the risks to AFTS were likely outweighed by the stream of income from SLG's business (as well as from other student loan debt relief merchants for whom AFTS was processing through a nested relationship with PAN):

> If AFTS were just starting into this business, the compliance effort would be greater than the short-term potential returns. But we currently have a significant critical mass of profitable business that is growing

rapidly – sufficient business to possibly pay for the compliance (risk mitigation/elimination) effort….

**Defendants' Knowledge of SLG's Violations of the Advance Fee Rule**

65.     Throughout the First Period, AFTS processed payments to SLG via nested relationships while knowing or consciously avoiding knowing that SLG was charging consumers fees before performing any debt relief services, in violation of the Advance Fee Rule.

66.     AFTS and Johnson knew since at least December 2015 that SLG was engaged in telemarketing, and had received a warning from Pefley (AFTS contracts manager) in December 2015 to make sure that SLG was not taking advance fees.

67.     At the time AFTS debited the consumers' bank accounts and forwarded these consumer funds to PAN or RubikPay, AFTS and Johnson knew that SLG had not transmitted the consumers' funds to the consumers' lenders. Defendants thus knew or consciously avoided knowing that SLG had not consolidated or settled the consumers' student loans prior to charging consumers an advance fee.

68.     AFTS and Johnson also knew that SLG had a practice of collecting and holding consumers' payments for a year in PAN's bank accounts, while making no payments to the consumers' lenders.

69.     SLG's practice of unlawfully collecting upfront fees from consumers was well known among AFTS's top management, including Johnson.

70.     From the beginning of AFTS's processing relationship with SLG, Johnson had knowledge of AFTS's potential liability under the TSR for providing substantial assistance to SLG, which was violating the Advance Fee Rule.  On August 18, 2014, Johnson wrote to AFTS's vice president: "I was a little concerned when Ken Martinez mentioned that they were [debt] 'consolidators.'  It sounds like he is servicing for organizations like the ones that put Meracord (Noteworld) out of business (and others possibly in jail)."

71.     In referencing *Meracord*, Johnson was referring to a case filed in October 2013 by the CFPB against payment processor Meracord.  The CFPB alleged that Meracord had violated the TSR by providing substantial assistance to debt relief service providers that Meracord knew, or consciously avoided knowing, were charging and collecting advance fees from consumers, in violation of the Advance Fee Rule.  *CFPB v. Meracord, et al*., No. 3:13-cv-5871, ECF No. 1 (W.D. Wash., Oct. 3, 2013).

72.     Although Defendants had long known or consciously avoided knowing that SLG was violating the TSR, by early 2016 they grew increasingly nervous about their potential liability under TSR for assisting and facilitating SLG in its violations of the TSR.

73.     For example, on February 12, 2016, AFTS's compliance officer sent

an email to Johnson and Martinez, stating:

> In doing a brief analysis of this authorization, AFTS and PAN are
> exposing their respective companies to tremendous liability under the
> "Substantial assistance" language of the TSR.… The rule prohibits
> sellers or telemarketers from requesting or receiving payment for
> providing debt relief services until three requirements are met…. It is
> illegal to front-load your fees… It's illegal to provide "substantial
> assistance" to another company if you know they're violating the Rule
> or if you remain deliberately ignorant of their actions.

74.     Later that day, Johnson sent a similar email to Pefley (AFTS former

contracts manager who, by then, had moved to RubikPay), describing the Advance

Fee Rule requirements and noting that AFTS until then had been "deliberately

ignorant" of SLG's violations of the TSR.  Johnson wrote:

> You have trained us to be concerned when fee income is taken in
> advance of service delivery. Review of recent FTC and CFPB actions
> have pointed out areas of the Telemarketing Act that even players like
> RubikPay and AFTS must be aware. Do you know where the credits
> are going? Have you made sure that the spirit and letter of the
> Telemarketing Act are being followed? AFTS has been "deliberately
> ignorant" so far, and that will need to change.

75.     In another email to Pefley, dated February 24, 2016, Johnson again

noted that SLG likely was violating the Advance Fee Rule, in addition to not

making payments ("check disbursements") toward consumers' student loans:

> AFTS is still concerned that significant fees are being taken prior to
> debt relief being accomplished by the SLGroup. AFTS has no
> information ensuring that proceeds of debits are properly used. They
> appear to be well laundered through RubikPay and NSP before ever

reaching the SLGroup. The check disbursements that AFTS expected
to see have not materialized.

76.     After analyzing SLG financial data, Pefley confirmed to Johnson that
SLG was unlawfully collecting advance fees.  She also confirmed to him that in
numerous instances SLG was not making payments towards consumers' student
loans.

77.     Pefley raised concerns about SLG's unlawful conduct with SLG's
principals, and they responded by ultimately terminating her employment in March
2016.

78.     Subsequently, Pefley warned Johnson about continuing to do business
with SLG's principals, stating:  "If you lay down with dogs, don't be surprised
when you get up with fleas."

79.     Despite knowing or consciously avoiding knowing that SLG was
violating the TSR, Defendants continued processing for SLG throughout the First
Period until SLG stopped using AFTS's services in March 2016.

**AFTS's Processing for SLG During the Second Period**

80.     Despite Defendants' knowledge of SLG's deceptive sales practices
and violations of the TSR during the First Period, Defendants resumed processing
for SLG, on their own initiative on October 1, 2017.  Johnson personally solicited
the business and directly negotiated AFTS's contract with SLG.

81.     In September 2017, Johnson approached one of SLG's officers and owners, Mazen ("Mike") Radwan, and sought to resume business with SLG. According to Radwan, Johnson asked him, "Are you still doing what you were doing?"  Mazen Radwan answered yes.  Johnson responded, "We want you back."

82.     During the Second Period, between October 2017 and July 2019, AFTS processed more than $17.4 million in ACH debits for SLG, this time directly, not through a nested relationship with other processors.  After debiting consumers' bank accounts, AFTS forwarded the funds directly to SLG.

83.     AFTS debited the bank accounts of two categories of consumers on behalf of SLG during the Second Period:  (a) SLG's "legacy customers," which refers to consumers who previously had been signed up by SLG and debited by AFTS during the First Period; and (b) SLG's "new customers," which refers to consumers signed up by SLG and debited by AFTS for the first time on or after October 1, 2017.

84.     The majority of debit transactions processed by AFTS during the Second Period were for legacy customers.  These legacy accounts were subject to monthly recurring SLG debits.

85.     Between October and December 2017, AFTS processed for both SLG's legacy customers and new customers under dba names used by SLG during

the First Period, *i.e.,* National Secure Processing, Student Loan Group, and EDU Student Loan.

86.     A few weeks after AFTS resumed processing for SLG, SLG informed Johnson that it planned on changing company names in order to distance itself from the "bad reputation" associated with SLG's previous company names that had been the subject of enforcement actions and consumer complaints on the internet.

87.     SLG informed Johnson that it would separate the processing of consumer debits into two different accounts under two new dba names: (a) Mission Hills Federal ("MHF"), which would "inherit" the old accounts of SLG's legacy customers; and (b) Federal Direct Group ("FDG"), which would acquire new customers signed up by the company after November 2017.

88.     On October 30, 2017, Johnson sent an email to AFTS's compliance officer and AFTS's controller, in which he wrote:

> [SLG] are forming a new company. Work will continue from the old portfolio, but no new customers will be added …They will have a new address, phones, email, etc. for all new work they are doing.. [SLG's attorney] will prepare an additional contract for the new entity shortly. A new FTP site will be needed along with a new ACH company name… They are aware of the shitty job they have been doing and are abandoning the reputation and liability with all state and federal agencies with the new entity.

89.     At the time AFTS resumed processing for SLG on October 1, 2017, Johnson and AFTS represented to Florida Capital Bank that SLG (and its more recent dba's) was not offering student loan debt relief services, but only student

loan "document preparation" services.  That new business was purportedly limited to merely filling out loan-related forms for consumers.

90.     In contrast with their representation to their bank, numerous emails and documents demonstrate that throughout the Second Period, Defendants knew or consciously avoided knowing that AFTS was processing for both SLG's legacy customers and new customers for essentially the same student loan debt relief services that SLG had offered during the First Period.

91.     For example, on November 15, 2017, SLG's attorney Bare sent an email to AFTS's compliance officer, in which he reiterated that MHF was "the entity that will be inheriting the [legacy] processing work from NSP."  With respect to FDG, his email attached the AFTS underwriting application form completed by FDG, together with a copy of FDG's telemarketing sales script.

92.     Both FDG's application form and telemarketing sales script made clear on their face that FDG was engaged in telemarketing and offering consumers, among other things, debt relief services, and not as Defendants had represented to AFTS's bank, merely "document preparation" services.

93.     FDG also disclosed on its application form that it previously had been the subject of investigations or actions by three different state attorneys general (North Carolina, Oregon, and Washington).  The application made no secret of the

fact that FDG was essentially the same company as SLG, that had been the subject of these actions.

94.     In response to AFTS's underwriting form question, "Does your company make payments or hold funds on behalf of the consumer?," FDG answered, "Yes."  In response to AFTS's underwriting form question, "Please describe the process through which payments are made to the loan company on behalf of the students; including when fees are taken; where funds are held until 1st loan payment is made; who is disbursing loan payments . . . ," FDG wrote in its answer:  "Fees are taken once per month.  Funds are held in a trust account. Payments are disbursed by payment processor (AFTS)."

95.     By confirming that its services included holding funds on behalf of consumers and making payments "to the loan company on behalf of the students," FDG's application form made clear to AFTS that FDG was offering student loan debt relief services, not merely document preparation services.

96.     Shortly after AFTS resumed processing for SLG, Florida Capital Bank noticed the high levels of returned transactions generated by SLG and its dba's.  It also notified AFTS of the high volume of consumer complaints and requests for returns regarding these merchants.  The bank repeatedly warned AFTS of the need to keep merchant return rates below the guidelines and thresholds established by NACHA.

97.    Shortly after resuming processing for SLG, AFTS began receiving consumer complaints which confirmed that both SLG and MHF were processing for legacy customers who had been duped by SLG in the First Period.  For example:

- On October 18, 2017, AFTS's controller emailed one of SLG's principals about a consumer complaint, stating "She is not happy because her payments are not being sent to the lender.  She wants payments to stop and would like a call back…."
- On January 30, 2018, an AFTS employee emailed SLG about another consumer, writing:  "… payments are coming out of her account, but the student loan company isn't receiving payments."
- In an email to AFTS's compliance officer, dated February 8, 2018, AFTS's controller forwarded an example of a consumer complaint that he had previously forwarded to SLG, writing:  "She called the holder of her student loan and they told her no payments have been made for two years.…"

98.    By early 2018, Florida Capital Bank grew increasingly alarmed about the high number of consumers complaining that SLG (or its dba's MHF and FDG) was in fact promising consumers student loan relief services, and that it was not making payments toward consumers' student loans.

99.    On February 8, 2018, the Electronic Payments Manager of Florida Capital Bank sent an email to Johnson, stating:

the bank is starting to receive a lot of phone calls stating that they have called your office.…the majority of calls are about EDU STUDENT LOAN…. the callers are stating that they have been making their student loan payments for a very long time and the student loan has not been credited. These calls concern me because AFTS stated in the due diligence process that you don't process student loan payments you just

process for companies that help consumers with the government programs.

100.   Later that day, Johnson sent an email to SLG's principals, informing them that Florida Capital Bank had been receiving alot of complaints regarding "EDU STUDENT LOAN," and that the callers were stating "that they have been making their student loan payments for a long time and the student loan has not been credited."  In his email, Johnson told the SLG principals:  "The Student Loan Group (and successor companies) started processing through PAN and RubikPay before we hired [AFTS's compliance officer] … You have somewhat been 'grandfathered'."

101.   AFTS continued to receive consumer complaints that SLG's new dba's were engaging in various deceptive practices.  For example, in a consumer complaint dated April 25, 2019, the consumer stated that he had not authorized the debit to his bank account by FDG, and that the third party who had processed the FDG debit had failed to apply the payment as he had instructed.  In another complaint regarding FDG, dated June 3, 2019, that was forwarded by a consumers' bank, the complaint listed 7 monthly FDG debits to the consumers' bank account that had not been authorized, and stated that "CREDITS WERE NOT APPLIED TO CLIENT'S LOANS."

102.   By spring 2019, Florida Capital Bank increased its pressure on AFTS to cease processing for FDG in light of FDG's high return rates.

103.    On May 21, 2019, Johnson wrote an email to one of SLG's principals in which he conveyed Florida Capital Bank's concerns that the consumer complaints indicated that FDG was engaged in student debt relief services, not merely offering "document preparation services".  But even then, Johnson did not propose terminating processing for FDG, but merely "re-underwriting" FDG. Johnson wrote:

> In addition, the bank has received calls from your customers, forwarded from their bank. Some of them have reported that their loans were not being paid. AFTS has underwritten your business model as "document prep" which is inconsistent with claims from your customers. We will need to re-underwrite your activities.

104.    Even after Florida Capital Bank advised AFTS that it would likely terminate FDG (together with other merchants processed by AFTS that were generating high return rates), and even after the bank made clear that consumers had complained that SLG (and its dba's, FDG and MHF) had failed to apply payments towards consumers' student loans, Defendants still chose not to terminate FDG.  Instead, they planned on continuing to process for FDG by simply moving its processing accounts to a different bank.

105.    For example, on June 7, 2019, AFTS's controller sent an email to AFTS's compliance officer, in which he discussed moving FDG, and other "crappy" merchants for which AFTS was then processing in a nested relationship with PAN, to another bank:  "I think we need to move those to [another bank].

Yes, we are giving them the crappy clients, but I would like to try to work with

Ken [Martinez] to improve the return rates for these clients.  This would buy us a

few more months to work on these clients."

106.    AFTS's processing for SLG only came to an end on July 8, 2019,

when the FTC sued SLG and obtained a temporary restraining order against the

fraudulent scheme.

### Defendants Were Aware of the TSR
### Requirements and Followed TSR Enforcement Actions

107.    Throughout the First and Second Periods, AFTS and Johnson closely

followed FTC and CFPB enforcement actions brought against student debt relief

companies for making misrepresentations and taking advance fees in violation of

the TSR, and against payment processors which processed for such companies in

violation of the TSR.

108.    Johnson routinely sent notices of law enforcement actions to AFTS's

employees, Martinez, SLG's attorney Bare, and RubikPay.  For example, in a

January 27, 2016 email to Martinez, Johnson wrote about a CFPB case against

payment processor Global Client Solutions, which processed for companies

marketing student debt relief services ("DRSP organizations"):

> They are a payment processor for DRSP organizations who do
> telemarketing. They were not immune to complicity for the failures of
> their clients because they could have or should have known their clients
> were acting illegally…   AFTS and PAN are payment processors for

DRSP organizations. We are not immune because we could have or should have known about the activities of our clients.

109.   The CFPB complaint against Global Client Solutions alleged that the company had violated the TSR by providing substantial assistance to merchants whom it knew were violating the TSR.

110.   On February 24, 2016, Johnson sent an email to Martinez, notifying Martinez of yet another FTC action brought against a student loan debt relief company (*FTC v. Good EBusiness LLC*, No. 2:16-cv-1048 (C.D. Cal.)), and stating:  "This action is only hours old… It is yet another complaint against the DRSP industry including student loan relief providers.  It is continuing to reinforce AFTS caution in providing services to this industry."  The FTC complaint in that action alleged that the merchant violated the TSR by, among other things, misrepresenting material aspects of its student loan debt relief services. *See id.* at ECF No. 1.

111.   AFTS's compliance officer also sent emails to Martinez notifying him of various law enforcement actions.  For example, in an April 11, 2016 email, he alerted Martinez to three actions brought by the CFPB against merchants offering various student loan debt relief services, in which the CFPB alleged that the defendants were liable for various deceptive and illegal practices in violation of the TSR and other laws.

112.   In a March 22, 2018 email to Johnson, AFTS's compliance officer alerted Johnson to another FTC action brought against a student loan debt relief services company called American Financial Benefits Center, in which the FTC alleged, among other claims, that while the merchant pretended that it would charge consumers fees merely for "document preparation" services, the merchant was in fact falsely promising consumers it would lower their monthly student loan payments and make payments to student lenders on behalf of consumers, in violation of the TSR. *FTC v. Am. Fin. Benefits Ctr.*, No. 4:18-cv-806, ECF No. 1 (N.D. Cal., Feb. 7, 2018).  AFTS' compliance officer forwarded Johnson a link to the FTC complaint in that action, stating that the complaint and pleadings "contain the allegations of the practices that most of our clients are currently participating in, and if the FTC wins, AFTS must no longer service this industry."

113.   AFTS's compliance officer also sent an email to Martinez, dated March 13, 2018, stating:  "You may want to pay attention to FTC v. American Financial Benefits Center [*sic*] this case has been receiving a fair amount of attention in the last month . . . We can talk more about the potential impact on the industry . . . , but I wanted you to be aware of a case of this magnitude floating around."

114.   In addition, Defendants had knowledge of at least two state law enforcement investigations of SLG.  AFTS received investigative demands

-33-

regarding SLG's potentially deceptive and illegal practices, including illegal

charging of advance fees, from the North Carolina Attorney General's Office in

February 2016, and from the Oregon Department of Justice in October 2016.

115.   Johnson was personally involved in overseeing AFTS's responses to

both the North Carolina and the Oregon investigative demands.

116.   On September 29, 2016, the North Carolina Attorney General filed a

complaint against SLG, alleging, among other claims, that it engaged in deceptive

practices, illegally collected advance fees, wrongfully retained consumer funds

instead of making agreed-upon payments to consumers' student loan servicers, and

that, in less than two years, the SLG principals had "collectively siphoned funds

well in excess of one million dollars for their personal benefit" from various

accounts held by SLG.

**Between 2016 and 2019, AFTS Processed for Other Student Loan Services Companies Through a Nested Relationship with PAN**

117.   Throughout 2016, in addition to its knowledge of SLG's practices

described above, AFTS had been concerned about numerous other student loan

service merchants that PAN was referring to AFTS for processing.

118.   For example, on February 12, 2016, AFTS's controller sent an email

to Johnson in which he stated that AFTS knew almost nothing about 21 additional

"student loan consolidator" companies referred to it by PAN, and for which AFTS

had agreed to provide nested processing services.  He wrote:

We have now set up 21 student loan consolidators through Ken [Martinez] …. Some are defunct and some have not yet begun debits. We need to slow Ken [Martinez] down before he gets himself (and us) in trouble. I looked through all the papers he sends for new customers … All that this paperwork verifies is that the client has set up a business. I have no confidence that any of these companies are legit (but no reason to suspect that they are not legit). I would like to have that confidence that they are legit….

119.    AFTS and Johnson knew that many of the student loan consolidators referred by PAN were companies that few banks would knowingly agree to process for.  For example, in a July 5, 2016 email Johnson sent to Martinez, Johnson wrote that PAN "is targeting the servicers that can't find services any place else."  More broadly, Johnson expressed his concerns about PAN's questionable underwriting practices, "willful blindness to CFPB and FTC rulings," and overall problematic "nested" business model.

120.    Despite Johnson's concerns regarding the type of merchants PAN was referring to AFTS, as well as PAN's poor underwriting practices and overall "business model," between 2016 and 2019 AFTS continued accepting and processing for student loan service merchants in addition to SLG through a nested relationship with PAN, most or all of which were referred to AFTS by PAN.

121.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because among other things: Defendants engaged in their unlawful acts or practices repeatedly over a period of more than 3 years,

Defendants engaged in their unlawful acts or practices knowingly, Defendants continued their unlawful acts or practices despite knowledge of numerous red flags (including numerous consumer complaints), Defendants resumed doing business with SLG even though they knew that SLG had engaged in deceptive practices and violated the TSR, Defendants only stopped processing charges for SLG after the FTC obtained a temporary restraining order against SLG, and Defendants remain in the payment processing business and maintain the means, ability and incentive to resume their unlawful conduct.

## THE TELEMARKETING SALES RULE

122.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

123.   During the relevant period, SLG was a "seller" or "telemarketer" engaged in "telemarketing" as those terms are defined in the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd).  A "telemarketer" means any person who, in connection with

telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).  "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

124.   During the relevant period, SLG was a seller or telemarketer of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

125.   The TSR prohibits sellers and telemarketers from making a false or misleading statement to induce any Person to pay for goods or services or to induce a charitable contribution.  16 C.F.R. § 310.3(a)(4).

126.   The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service.  16 C.F.R. § 310.3(a)(2)(x).

127.    The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

(A)    The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

(B)    The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor . . .

16 C.F.R. § 310.4(a)(5)(i).

128.    The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in acts or practices that violate Sections 310.3(a), (c), or (d), or Section 310.4 of the TSR. 16 C.F.R. §310.3(b).

129.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATION OF THE TELEMARKETING SALES RULE

## COUNT I

130.   In numerous instances, Defendants provided substantial assistance or support to a seller or telemarketer, that Defendants knew, or consciously avoided knowing, was violating:

A. Section 310.3(a)(4) of the TSR by making false or misleading statements to induce consumers to pay for goods or services;

B. Section 310.3(a)(2)(x) of the TSR, by engaging in misrepresentations regarding material aspects of its student loan debt relief services; or

C. Section 310.4(a)(5)(i) of the TSR, by requesting or receiving payment of a fee or consideration for debt relief services, before: (i) SLG had renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (ii) the customer had made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and his or her creditor.

131.   Defendants' acts or practices alleged in Paragraph 133 above constitute deceptive telemarketing acts or practices, in violation of the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

132.   Consumers are suffering and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  Absent

injunctive relief by this Court, Defendants are likely to continue to injure

consumers, and harm the public interest.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

A.   Enter a permanent injunction to prevent future violations of the FTC Act and

TSR by Defendants;

B.   Award monetary and other relief as provided by law; and

C.   Award any other and additional relief as the Court determines to be just and

proper.

Dated:   November 5, 2021



**FEDERAL TRADE COMMISSION**

s/Russell Deitch

_____

Russell Deitch, Attorney
Federal Trade Commission
600 Pennsylvania, Ave. N.W.
Washington, DC 20580
202-326-2585 (Deitch)
rdeitch@ftc.gov